NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3059-16T2

JOHN E. SUSKO, FRANCINE M. DOLAN, KYLE BROWN, MICHAEL SEEBECK, PATRICIA COREA, NOREEN DEAN, JAMES BEAN, and JOY DESANCTIS,[1]

Plaintiffs-Respondents,

v.

BOROUGH OF BELMAR and MAYOR AND COUNCIL OF THE BOROUGH OF BELMAR,

Defendants-Appellants.

---

**APPROVED FOR PUBLICATION**

**April 22, 2019**

**APPELLATE DIVISION**

Argued September 20, 2018 – Decided April 22, 2019

Before Judges Alvarez, Nugent and Reisner.

On appeal from Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-1427-15.

William W. Northgrave argued the cause for appellants (Mc Manimon, Scotland & Baumann, LLC, attorneys; William W. Northgrave and Thaddeus J. Del Guercio, III, on the briefs).

---

[1] Plaintiffs Dolan and DeSanctis passed away while this litigation was pending.

Kenneth E. Pringle argued the cause for respondents (Pringle Quinn Anzano, PC attorneys; Kenneth E. Pringle, of counsel and on the brief; Denise M. O'Hara, on the brief).

The opinion of the court was delivered by

REISNER, J.A.D.

In response to the physical and economic devastation wrought by Superstorm Sandy, the Borough of Belmar took, or planned to take, a series of actions that were inconsistent with a thirty-year-old but still binding court decision in Slocum v. Borough of Belmar, 238 N.J. Super. 179 (Law Div. 1989). The trial court found that the Borough improperly used funds derived from beach fees (beach funds) to settle non-beach related litigation; improperly deposited into the Borough's general fund certain donations raised through a campaign to help rebuild the boardwalk (the buy-a-board donations); planned to improperly use the buy-a-board donations, and certain other funds restricted for beach use, to rebuild a boardwalk pavilion (the Taylor Pavilion) that was largely used for non-beach purposes; and doubled the fees for beach-front parking spaces in order to raise money for the general fund. The trial court found that defendants' actions or planned actions violated the Borough's obligations under the public trust doctrine and N.J.S.A. 40:61-22.20, which was enacted to implement the doctrine. The trial court also concluded that the Borough violated plaintiffs' substantive civil rights and awarded plaintiffs

about $170,000 in counsel fees and costs under the New Jersey Civil Rights Act (CRA), N.J.S.A. 10:6-2(f).[2]

In challenging the resulting trial court orders, defendants – the Borough, and its Mayor and Council – contend that most of plaintiffs' issues were not ripe; the trial court's decision violated the separation of powers doctrine; the court erred in holding that the Borough must use the buy-a-board donations to rebuild the boardwalk; the court erred in finding that violations of the public trust doctrine were substantive rights for purposes of a counsel fee award under the CRA; the court erred in voiding the ordinance doubling the parking fees; paying litigation fees from the beach fund did not violate the public trust doctrine or the CRA; no counsel fee could be awarded because plaintiffs' attorney had no retainer agreement; the counsel fee award was excessive; and any fee award should be paid from the beach fund instead of the general fund.

We conclude that the disputes in this case were ripe for adjudication. We affirm the orders on appeal, except that we modify the order awarding counsel fees under the CRA. We hold that when a municipality violates the beach fee statute, N.J.S.A. 40:61-22.20, by charging unreasonable beach fees, that violation constitutes the deprivation of a substantive civil right under the

[2] The trial court memorialized its decisions in orders dated January 27, 2016, September 27, 2016, and February 16, 2017.

New Jersey Civil Rights Act, and a successful plaintiff is entitled to counsel fees. However, because the CRA requires the violation of an unambiguous, specific statutory or constitutional provision, most of the conduct plaintiffs proved in this case, while wrongful, did not establish CRA violations or entitle them to counsel fees.

Under the limited circumstances of this case, we agree with the trial court that parking fees – charged only for beach-front parking and nowhere else in the Borough – constituted beach fees. The record supports the trial court's findings that doubling the parking fees in order to raise general revenues for the Borough imposed an unreasonable beach fee on users of the beach. Plaintiffs are entitled to counsel fees under the CRA for that violation of N.J.S.A. 40:61-22.20. Plaintiffs did not prove that the Borough's regular beach-badge fees were unreasonable, nor did they prove that they were physically excluded from any portion of the Borough's beach. Because CRA counsel fees are available for the violation of N.J.S.A. 40:61-22.20 that plaintiffs proved, we do not reach the separate issue of whether counsel fees are available under the CRA solely for a violation of the common-law public trust doctrine.

I

As background, it is helpful to briefly review the public trust doctrine and the Slocum decision.

The public trust doctrine refers to the common-law principle that a state holds, "'in trust for the people,'" "'ownership, dominion and sovereignty' over tidally flowed lands" extending to the mean high water mark. City of Long Branch v. Liu, 203 N.J. 464, 474-76 (2010) (quoting Matthews v. Bay Head Improvement Ass'n, 95 N.J. 306, 316-17 (1984)). Accord Borough of Neptune City v. Borough of Avon-By-The-Sea, 61 N.J. 296, 303-04 (1972) (stating that "land covered by tidal waters belonged to the sovereign, but for the common use of all the people"). The public trust doctrine guarantees the public's right to reasonable access to the trust lands. Raleigh Ave. Beach Ass'n v. Atlantis Beach Club, Inc., 185 N.J. 40, 51-55 (2005). "[W]ithout access the doctrine has no meaning." Id. at 53 (citing Matthews, 95 N.J. at 323).

Our courts have extended the uses covered by the public trust doctrine, beyond navigation, commerce, and fishing "to recreational uses, including bathing, swimming and other shore activities." Avon, 61 N.J. at 309. See Lusardi v. Curtis Point Prop. Owners Ass'n, 86 N.J. 217, 228 (1981) ("The public trust doctrine is premised on the common rights of all the State's citizens to use and enjoy the tidal land seaward of the mean high water

mark."). To accommodate these uses, our courts consequently extended the public's right of accessibility beyond the foreshore to the beaches and the upper dry sand areas. Times of Trenton Publ'g Corp. v. Lafayette Yard Cmty. Dev. Corp., 183 N.J. 519, 532 (2005) (stating that "the doctrine has been applied in New Jersey to ensure access by the public to areas of the beach"). "Whether natural, or man-made, the beach is an adjunct to ocean swimming and bathing and is subject to the Public Trust Doctrine." Van Ness v. Borough of Deal, 78 N.J. 174, 180 (1978). See also Lusardi, 86 N.J. at 228 (stating that the scope of the doctrine was expanded to beaches "[b]ecause the use of dry sand beaches is practically inseparable from enjoyment of ocean swimming").

Our courts have also emphasized the importance of equal access: "a modern court must take the view that the public trust doctrine dictates that the beach and the ocean waters must be open to all on equal terms and without preference and that any contrary state or municipal action is impermissible." Avon, 61 N.J. at 309. Over the years, our courts have enforced the public trust doctrine by overturning actions favoring residents over non-residents with regard to access to and fees for using beaches and related facilities. In Van Ness, 78 N.J. at 180, the Court held that a municipality could not set aside part of its public beach for use by residents only. In Matthews, 95 N.J. 330-32, the Court held that a beach owned and operated by a quasi-public association with

close connections to the municipality could not exclude certain beach-goers from the dry upland portion of the beach. In Avon, 61 N.J. at 310, the Court overturned an ordinance that restricted the sale of seasonal beach badges to residents, which resulted in non-residents paying disproportionately higher fees for daily and monthly badges.

In Slocum, the plaintiff filed a wide-ranging challenge to the Borough's beach fees and its alleged misuse of the fees for purposes unrelated to the beach. After a trial, a Law Division judge invalidated the Borough's beach fee schedule, finding that it discriminated against non-residents by doubling the fees on weekends as compared to weekdays, and by charging more for the cost per day of a weekend daily badge than the cost per day for a seasonal badge. Slocum, 238 N.J. Super. at 190. "The majority of weekend badge purchasers were nonresidents . . . [and b]y paying a vastly greater per day price for their badges, the daytrippers have been subsidizing season badge holders." Ibid.

The judge also reasoned that, because the State holds certain lands in trust for the public, municipalities have a duty to take special care to account for all "beachfront related expenditures" and "beachfront related revenues." Id. at 183, 188. The judge determined that the Borough had "breached its duty of loyalty to the public" as trustee under the public trust doctrine by increasing "beach admission fees," rather than real estate taxes, in order to raise general

revenues. Id. at 188. In fact, the judge found that the Borough had commingled its beach badge revenues with its general revenues, essentially "operat[ing] the beach area as though it were a commercial business enterprise for the sole benefit of its taxpayers." Ibid. He found: "This conduct resulted in surplus beach fee revenues being used to subsidize other municipal expenditures for the exclusive benefit of the residents of Belmar, rather than being set aside to meet future beach-related costs." Ibid. Thus, the judge held that the Borough had violated its "duty under the public trust doctrine" by "plac[ing] the interest of Belmar's residents before those of the beachgoers." Ibid.

As a remedy for Belmar's past violations of the public trust doctrine, to prevent future violations, and to effectuate its obligation as a trustee of its beach-fee related funds, the judge ordered the Borough to keep clear financial accounts in the future:

> Commencing with the 1990 summer season, Belmar shall maintain complete, accurate, and traceable records documenting the costs relating to its beachfront facilities. Belmar shall maintain a separate beach account in which all revenues collected by the borough, from beach admission fees and any other beach use fees, shall be deposited, and from which all expenditures for beach related costs will be paid.
>
> [Id. at 208.]

Based on extensive expert testimony, the judge also specifically delineated the allowable beach-related costs that could be included as components of the Borough's beach fees. Id. at 196-208.

To comply with Slocum, the Borough created a beach utility fund (beach fund), which was separate from its municipal general fund. At the time the current litigation arose, the Borough was still required to comply with Slocum.

II

As a precursor to our legal analysis, we briefly summarize the evidence presented in the trial court. In 2012, Superstorm Sandy caused extensive damage along the Borough's beachfront. The storm virtually destroyed the boardwalk and several pavilions located along the boardwalk. Some of the pavilions had been built, or rebuilt after previous storms, using money raised from beach-badge fees, and they were used for beach-related purposes. But the Taylor Pavilion was not built with beach funds and had primarily been used for community functions unrelated to the beach. The Borough anticipated that it would receive insurance proceeds from policies covering the pavilions, as well as money from the Federal Emergency Management Agency (FEMA) to cover some reconstruction costs. In an effort to raise private funds toward the cost of rebuilding the boardwalk, the Borough also conducted a "buy-a-

board" campaign, telling potential donors that their donations would allow them to pay for actual boards on the boardwalk.

The Borough planned to use insurance proceeds and FEMA reimbursement money associated with beach-related pavilions to rebuild the Taylor Pavilion. The Borough also anticipated using the buy-a-board donations for that purpose. The Borough Council planned to issue bonds to fund the Taylor Pavilion construction, and it anticipated using the insurance, FEMA, and buy-a-board monies to repay the bonds. In addition, to avoid raising taxes on its residents, the Borough doubled the parking fees along the street adjacent to the beach, and paid certain non-beach-related litigation expenses using money from its beach fund instead of from its general fund. Plaintiffs filed a nine-count complaint challenging these actions as violating Slocum, violating the public trust doctrine, and violating the beach fee statute. After hearing motions and a two-day bench trial, the trial court decided the issues in plaintiffs' favor.

III

We will defer to a trial court's factual findings so long as they are supported by substantial credible evidence. Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974). We owe particular deference to a trial court's evaluation of witness credibility. Cesare v. Cesare, 154 N.J. 394,

412 (1998). However, we engage in de novo review of a trial court's legal interpretations. Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

We begin by addressing the issue of ripeness. In deciding whether an issue is ripe, the court should consider whether the issues are fit for judicial review and whether withholding judicial review would cause hardship to the parties. K. Hovnanian Cos. of N. Cent. Jersey, Inc. v. N.J. Dep't of Envtl. Prot., 379 N.J. Super. 1, 9 (App. Div. 2005). On this record, we affirm the trial judge's decision that the issues were ripe, substantially for the reasons stated in her thoughtful oral opinions of October 6, 2015, and October 23, 2015. We add these comments.

As the trial court noted, the Borough had taken certain concrete steps toward misallocating some of the beach funds and violating requirements imposed by Slocum. Under the Slocum opinion – the validity of which defendants did not question in the trial court and do not question here – beach fund monies were to be treated as trust assets. Slocum, 238 N.J. Super. at 187-88. Slocum found that the Borough had routinely misused beach revenues, failed to properly account for beach fees, and "operated the beach area as though it were a commercial business enterprise for the sole benefit of its taxpayers." Id. at 188. Slocum imposed certain prophylactic remedies to

preclude future misuse of beach funds and make it easier to determine whether future beach fees were reasonable. Those remedies included a requirement that the Borough place all beach funds in a dedicated account. Id. at 208.[3] There was evidence before the trial court that the Borough was violating the Slocum decision by placing $727,000 in buy-a-board proceeds in a non-beach account. Further, due to the Borough's failure to use those proceeds to pay off a boardwalk construction bond, the beach fund was incurring about $36,000 a year in interest costs on the bond.

The trial court also determined that the parties needed a decision on the allowable use of FEMA reimbursement funds, insurance proceeds, and the buy-a-board funds, in time for an upcoming referendum on whether to issue about $4 million in bonds to pay for construction of the Taylor Pavilion. Underlying the referendum was a dispute over whether the FEMA, insurance,

---

[3] Our view of Slocum finds support in the following observation:

> [W]e are not convinced that Slocum should be read, as plaintiffs demand, to require a municipality to maintain a separate account for beach tag revenue in all cases. Slocum provides an example of a remedy that may be used in a case where serious accounting irregularities have been proven. The nature of the remedy is necessarily dependent on the severity of the irregularities uncovered.
>
> [Secure Heritage, Inc. v. City of Cape May, 361 N.J. Super. 281, 310 (App. Div. 2003).]

and buy-a-board monies could be used to repay the bonds. Through a petition drive, objectors to the rebuilding project had already forced the Borough to hold a referendum on the bond issue. The record here reflects that municipal government officials then embarked on a campaign of disinformation, designed to influence the outcome of the referendum.

DeSanctis v. Borough of Belmar, 455 N.J. Super. 316 (App. Div. 2018), a separate lawsuit filed by some of the same plaintiffs who filed this case, supports the judge's decision that the dispute in this case was ripe. In DeSanctis, the municipal clerk drafted an interpretive statement for the same referendum involved in the present case. Id. at 322. We affirmed the trial judge's finding that, viewed in context, the interpretive statement was not an objective explanation of the referendum. Id. at 332-33, 335. Instead, it was biased and designed to "sell" the referendum to voters based on a representation that the Borough would use FEMA and other funds to repay the bonds without expense to the taxpayers.[4] Id. at 331-32. That was part of the same pattern of conduct involved here, including the mayor's public statements

[4] In DeSanctis, we also affirmed the trial court's award to plaintiffs of about $40,000 in counsel fees under the CRA, for unlawfully interfering with plaintiffs' substantive right of referendum. Id. at 334-35. See Tumpson v. Farina, 218 N.J. 450, 480-81 (2014).

and emails to constituents, designed to convince voters that the $4 million bond issue would cost the Borough's taxpayers nothing.

The same trial judge who presided over this case was handling DeSanctis and was therefore familiar with the Borough's campaign to convince voters to support the referendum. The judge was also familiar with the long history of disputes over Belmar's use or misuse of beach funds. That litigation included an injunction issued by Assignment Judge Lawrence M. Lawson, precluding the Borough from spending beach funds to rebuild the Taylor Pavilion.[5] The trial judge also construed the parties' joint submission of issues – which referred to "the Borough's plans" to take the disputed actions – as an admission by the Borough that it had such plans. We find no error in the trial judge drawing that inference.

Given the history of this litigation, we cannot say the trial judge erred in deciding that there was a genuine dispute over which assets belonged in the beach fund and that there was a current need for a declaratory ruling as to the proper allocation of the funds, even in the absence of a municipal

---

[5] The injunction was dissolved and the litigation dismissed without prejudice, after the Borough abandoned its plan to implement a bond ordinance that would have explicitly funded non-beach construction with beach funds. The evidence supports a conclusion that, in adopting the next ordinance, Ordinance 2015-25, the Borough planned to accomplish indirectly that which Judge Lawson had enjoined it from doing directly.

appropriation of the funds or other legally binding action by the Borough Council.

IV

Several of defendants' additional arguments are clearly without merit and warrant only brief discussion. See R. 2:11-3(e)(1)(E).

Defendants argue that they were entitled to use the buy-a-board funds to reconstruct the Taylor Pavilion and the trial court erred in holding otherwise. We disagree. The buy-a-board funds were not beach fees. However, they were voluntary contributions, raised through a solicitation that clearly indicated they would be used to pay for the reconstruction of the boardwalk.

The proper use of those contributions is governed by the statute addressing the use of funds raised by bequests, legacies and gifts. That statute, N.J.S.A. 40A:5-29, states in pertinent part: "Any local unit is authorized and empowered to accept . . . gifts made to it and is empowered to utilize such . . . gifts in the manner set forth in the conditions of the . . . gift . . . ." (emphasis added). For the reasons stated in the trial judge's October 23, 2015 oral opinion, we conclude that the buy-a-board donations were solicited for the explicit purpose of rebuilding the boardwalk, and the language of the solicitations constituted the "conditions" of the gifts or donations. N.J.S.A.

40A:5-29. The judge's factual findings, underlying her legal conclusions, are supported by substantial credible evidence. Rova Farms, 65 N.J. at 484.

As the judge concluded, the fundraising proceeds constitute a trust for the purpose for which they were solicited, and hence, the funds must be used for boardwalk construction and cannot be used to rebuild the Taylor Pavilion. Accordingly, the donations must be deposited in the beach fund and used to pay for reconstruction of the boardwalk. Defendants' arguments to the contrary are without sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E).

On this appeal, defendants do not challenge the substance of the trial court's decision determining the extent to which beach funds could be used to reconstruct the Taylor Pavilion, although they contend the issue was not ripe for decision. The funds at issue derived from pavilions whose prior construction was paid for with beach fees. The court held that when those pavilions were destroyed by Sandy, the insurance proceeds and FEMA reimbursement funds received, or to be received in future by the Borough, had to be allocated to the beach fund and used for beach purposes. With respect to the Taylor Pavilion, which was primarily to be used for non-beach purposes, the judge held that a portion of those funds could be used to pay the proportionate cost of rebuilding the relatively small area of the building that

would be used for beach purposes. We affirm that decision, as to ripeness and as to the merits, for the reasons stated by the trial court.[6]

We agree with the trial judge that the Borough was not entitled to spend money from the beach fund to settle claims from a lawsuit (known as the "Partner Litigation") that were unrelated to the beach. That issue was ripe for the court's consideration. While the case was pending in the trial court, the parties were able to agree on which portion of the Partner Litigation settlement should be paid from the beach fund and which portion should be paid from the general fund. Accordingly, they agreed that the general fund would reimburse the beach fund for the former's share of the settlement obligation.

V

We next turn to the parking fee issue, which concerns parking spaces on the beach side of Ocean Avenue. The Slocum decision apparently assumed that parking fees could be considered beach-related income, because it held that the administrative costs associated with maintaining the parking meters could be charged to the beach fund. See Slocum, 238 N.J. Super. at 206. Slocum also approved the use of beach funds to pay for what it called "traffic and paint supplies" on Ocean Avenue adjacent to the beach, because they were

[6] Defendants' brief advised us that the Taylor Pavilion has now been rebuilt. We presume defendants complied with the trial court's order in paying for the reconstruction.

associated with "the summer parking lines." Id. at 199-200. The Slocum court further approved allocating "a small percentage of road repair costs" to the beach fund due to "increased volume of traffic on the streets during the summer months[.]" Id. at 202. As previously noted, defendants did not ask the trial court to relieve them from the orders resulting from Slocum, but instead accepted that the Borough was still bound by the Slocum decision. As a result, we need not decide whether the public trust doctrine or N.J.S.A. 40:61-22.20 apply to parking fees generally. However, we add these observations pertinent to this particular case.

At oral argument on May 6, 2016, both sides agreed on the essential facts concerning parking in the Borough. There are no parking lots where beach users can park. Therefore, anyone arriving by car to use the beach must use street parking. The Borough does not charge for street parking (i.e., through meters or parking kiosks) anywhere except for the parking spaces on the eastern side of Ocean Avenue, directly adjacent to the beach. Under those unique circumstances, it is reasonable to conclude that the parking fees are a form of beach fee – a fee aimed at persons who are parking in order to obtain access to the beach. The Borough has essentially conceded that point for decades; it has allocated sixty percent of the parking revenue to the beach fund and forty percent to either its general fund or a parking utility fund, on the

theory that the majority of parking revenue comes from beach users, but some parking revenue is earned at night from people who do not intend to use the beach. In turn, Slocum allows the Borough to charge the beach fund for the upkeep of the meters and for other costs related to the parking spaces.

We affirm the trial court's finding that in 2013 and 2014, the Borough departed from the sixty-forty split of income between the parking utility fund and the beach fund without a financial justification.[7] We also find that the trial court's decision, ordering the allocation to the beach fund of parking fees paid during hours the beach was open to the public, was reasonable and supported by the evidence. Rova Farms, 65 N.J. at 484.

There is also substantial credible evidence to support the judge's finding that the one hundred percent increase in the hourly parking fee, from a dollar to two dollars per hour, was not imposed to pay for permissible beach-related costs, but was instead aimed at increasing the Borough's general revenues to avoid raising taxes on its residents. Contrary testimony from the Borough's CFO was vague and not supported by documentary evidence. The mayor and

[7] In her deposition testimony, the Borough's Chief Financial Officer (CFO), Robbin Kirk, admitted that she did not note any interfund loan on the Borough's books and records, which would have indicated an intent to reimburse the beach fund for a temporary fund transfer to the parking fund. The record supports the judge's finding that Kirk had no intention of causing any such repayment.

Borough Council members repeatedly expressed their intent to increase general revenues without raising taxes, and the Council rejected proposals to impose parking fees anywhere else in the town. Given this particular town's past history as detailed in Slocum, and its current policy of charging for parking on the beachfront and nowhere else in the town, we conclude there was sufficient credible evidence to support the trial court's findings that the parking charge amounted to a beach fee and the town violated N.J.S.A. 40:61-22.20, by imposing on beach users an unreasonable increase in that fee.

To be clear, we are not holding that any and all fees for parking near a beach necessarily constitute beach fees; that issue is not before us. However, the record here supports the trial court's finding that these parking fees were beach fees. The record also supports the court's conclusion that in doubling the fees, the Borough was intentionally and improperly using beach fees to raise money for its general fund, to avoid raising taxes on its residents. "Limiting access by placing an unreasonable economic burden on the public undermines the objectives of the public trust doctrine to the same extent as any physical barrier. . . . The notion that lands are to be held in public trust, protected and regulated for the common use and benefit, is incompatible with the concept of profit." Raleigh Ave. Beach Ass'n v. Atlantis Beach Club, Inc., 370 N.J. Super. 171, 193 (App. Div. 2004), aff'd, 185 N.J. 40 (2005).

VI

Before reaching the CRA counsel fee issue, we find it necessary to address more precisely the violations the Borough committed. We agree with the trial judge's conclusions that the Borough misallocated and misused some beach-related funds, for the reasons she stated. However, apart from parking fees, the judge did not decide the reasonableness of the Borough's beach fees, an issue that was not before her in any event. In their appellate brief, plaintiffs argue that we can infer from the record that they paid unreasonable beach-badge fees, but their claim is unsupported by the evidence. Plaintiffs assert that if the Borough misspent money from the beach fund, or failed to deposit monies into the fund that belonged there, the beach-badge fees the Borough charged must necessarily be unreasonable. We cannot agree.

The Slocum case illustrates the kind of expert evidence needed to present a rate-setting case concerning the reasonableness of beach-badge fees. See Slocum, 238 N.J. Super. at 192-93, 196-207. The evidence in this case did not approach that level of detail. There was, for example, no evidence as to the reasonableness of the amount of the reserve in the beach fund.[8] At most, there was evidence that buy-a-board funds that should have been placed in the

[8] Our courts have consistently recognized that a municipality may maintain "a reasonable annual reserve designed to meet expected future capital expenses" connected with the beach. E.g. Avon, 61 N.J. at 311.

beach fund were placed in another account, some beach-related funds were improperly spent to pay litigation expenses, and the Borough government had future plans to spend beach funds on non-beach projects. However, those plans had not yet been implemented and might never have been implemented if the voters disapproved the bond ordinance for the Taylor Pavilion. There was also evidence that the beach fund could have avoided paying about $36,000 in annual bond interest if the Borough had used the buy-a-board proceeds to pay down the bonds. But, there was no evidence that the $36,000 would have made a difference to the reasonable amount of beach fees charged.

Plaintiffs did not introduce the type of expert rate-setting testimony that would have been needed to support a conclusion that the current beach-badge fees the Borough was charging were unreasonable. In fact, their complaint did not even specifically allege that those rates were unreasonable.[9] Nor did they introduce the type of expert evidence the court relied on in Slocum concerning the reasonableness of the amount of the beach fund reserve. Those are not trivial evidentiary gaps. Superstorm Sandy had recently inflicted tens of millions of dollars in damage to the beach and boardwalk. Absent expert

[9] On December 16, 2014, the Borough Council passed Resolution 2014-196, increasing the beach-badge fees for 2015. However, plaintiff's second amended complaint, which was the basis for this litigation, did not challenge that resolution or seek to enjoin the increases from taking effect.

testimony, one cannot say that it was unreasonable for the Borough to maintain a significant reserve in the beach fund against potential future storm damage, or that it was unreasonable to raise the beach-badge fees.

After reviewing the transcripts, we also have reservations about some of the language the court used concerning the absolute duty to maintain beach fee proceeds in the beach account at all times, and the imprecise use of language concerning the identity of money raised through beach fees. To address the latter issue first, both plaintiffs and the court repeatedly referred to the funds as belonging to beachgoers, as though they had an individual right to the money, which would be violated by any misallocation of the funds. The characterization is inaccurate. The funds belong to the municipality, albeit they can only be used for restricted purposes relating to the beach, as provided in N.J.S.A. 40:61-22.20.

The Borough's CFO, Robbin Kirk, testified that it is not unusual for a municipal fiscal administrator to transfer money back and forth between accounts during a fiscal year to meet temporary shortages in one account or the other. Kirk testified that on occasion, she had transferred funds from another account to the beach fund to meet a temporary shortfall in the beach fund, and vice versa. She testified that was not deemed improper accounting so long as the Borough's accounts documented the interfund transfers, so that money

temporarily transferred from one fund to another would be reimbursed to the proper fund. There was no testimony, expert or otherwise, that this was improper or not a generally accepted practice in municipal finance and accounting.

The Borough does not challenge that it remains bound by the accounting procedures set forth in Slocum. However, that does not necessarily mean that any violation of Slocum is itself a violation of the public trust doctrine or of plaintiffs' substantive civil rights. In ruling otherwise, the trial court essentially morphed prophylactic remedies or procedures, designed to prevent violations of the public trust doctrine, into elements of the doctrine itself and characterized any variation from those procedures as violations of individual, substantive civil rights. Taking that approach conflates substantive rights with procedural remedies, may unduly involve courts in the day-to-day business of municipal accounting, and may encourage unnecessary litigation. See Secure Heritage, 361 N.J. Super. at 310 (declining to read Slocum as "requir[ing] a municipality to maintain a separate account for beach tag revenue in all cases" provided the municipality has an appropriate accounting system in place for its general fund).[10]

[10] The Legislature recently reaffirmed the broad authority of the Department of Environmental Protection (DEP) to protect the public's right of access to (continued)

VII

Next, we address the CRA issue and plaintiffs' claim for counsel fees. We begin with the observation that plaintiffs did not need to assert a substantive, individual civil right in order to have standing to file this lawsuit. "[T]he standing of a taxpayer to attack illegal disbursements of public funds or other illegal official action has been long and firmly established." Crescent Park Tenants Ass'n v. Realty Equities Corp. of N.Y., 58 N.J. 98, 102 (1971). Consequently, the fact that plaintiffs filed the lawsuit to rectify misallocation of expenses for the Partnership Litigation, correct violations of accounting procedures required by Slocum, and prevent the future misuse of various funds, does not determine their right to counsel fees under the CRA.

---

(continued)
tidally flowed waters and their adjacent shorelines under the public trust doctrine, through the agency's permitting authority in N.J.S.A. 12:5-3(d) (regulating waterfront development) and N.J.S.A. 13:19-10(h) (regulating costal development). See L. 2015, c. 260. Those statutory amendments responded to our opinion in Hackensack Riverkeeper, Inc. v. New Jersey Department of Environmental Protection, 443 N.J. Super. 293 (App. Div. 2015), which invalidated DEP's public access rules. See Senate Env't & Energy Comm. Statement to S. 3321 (Jan. 7, 2016). Pursuant to its current regulations, N.J.A.C. 7:7-16.9, under the circumstances set forth therein, DEP has authority to review the reasonableness and use of beach-badge and parking fees. N.J.A.C. 7:7-16.9(v). See 49 N.J.R. 3145(a) (Sept. 18, 2017). See also N.J.A.C. 7:7-9.48 (addressing public trust rights). In addition, the Supreme Court previously recognized DEP's power to review beach fees as part of its authority to regulate coastal development. See Raleigh Avenue, 185 N.J. at 61-62. DEP's exercise of its oversight authority may mitigate the need for individual lawsuits challenging the reasonableness of beach fees.

The CRA does not extend the right to counsel fees for any and all successful litigation against a government entity. It is limited to successful litigation concerning individual substantive rights guaranteed by "laws" or by the Constitution. The CRA provides in relevant part:

> Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any <u>substantive rights, privileges or immunities secured by the Constitution or laws of this State</u>, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.
>
> [N.J.S.A. 10:6-2(c) (emphasis added).]

We previously construed this provision as requiring either (a) a deprivation of a substantive right; or (b) threats, intimidation, or coercion constituting an interference or attempted interference with the right.

> [P]lacement of a comma after "laws of this State" and before the word "or" divides the clause into two separate, independent phrases that do not act to modify nor qualify one another. Thus, properly read, the statute provides a person may bring a civil action under the Act in two circumstances: (1) when he's deprived of a right, or (2) when his rights are interfered with by threats, intimidation, coercion or force. Clearly, defendants' contrary interpretation renders the terms "deprive" and "interfere" indistinguishable, yet they are clearly different in meaning. Indeed, it makes sense to require, as the

> Legislature evidently did, that a plaintiff show "threats, intimidation or coercion" were employed if constitutional rights were merely interfered with or an attempt was made at interfering with them, and that no such showing is required where one has actually been deprived of the right.
>
> [Felicioni v. Admin. Office of the Courts, 404 N.J. Super. 382, 400 (App. Div. 2008).]

In Tumpson v. Farina, 218 N.J. 450 (2014), the Supreme Court confirmed that reading. In Tumpson, a municipal clerk unlawfully refused to file a referendum petition. In determining whether the plaintiffs were entitled to counsel fees under the CRA, the Court observed:

> Although N.J.S.A. 10:6–2(c) provides relief for either the deprivation of a statutory substantive right or the interference with such a right "by threats, intimidation or coercion," no one contends that the Clerk engaged in "threats, intimidation or coercion" in refusing to file the referendum petition. Therefore, plaintiffs cannot look to the interference portion of this statute for relief. Their claim under the Civil Rights Act must rise or fall on whether the Clerk deprived them of a substantive right.
>
> [Id. at 473.]

In Tumpson, the Court found that the right at issue was "substantive" because it gave rise to a cause of action to enforce a right specified in the referendum statute, and the Legislature did not intend to withhold relief under the CRA merely because the plaintiffs could enforce their rights through an action in lieu of prerogative writs. Id. at 478-79. Instead, the Legislature would have

intended to empower voters to enforce the right of referendum, because it is fundamental to representative democracy. Id. at 480-81.

The Court rejected the defendant's argument that the plaintiffs were not entitled to counsel fees because they obtained injunctive relief and hence were not "deprived" of their right to file the petition.

> Certainly, before plaintiffs secured judicial relief, the Clerk's refusal to file their referendum petition took away, withheld, and kept plaintiffs from enjoying their right of referendum. That the Law Division later provided a judicial remedy by compelling the Clerk to abide by the Faulkner Act and process the referendum petition does not alter the nature of the Clerk's earlier act, which deprived plaintiffs of a statutory right.
>
> [Id. at 481.]

Most recently, in Harz v. Borough of Spring Lake, 234 N.J. 317 (2018), the Court set forth a three-step test, derived from Blessing v. Freestone, 520 U.S. 329, 340-41 (1997), to determine whether a right is "substantive" for purposes of the CRA. See also Gonzaga Univ. v. Doe, 536 U.S. 273 (2002).

> In the three-step test, a court must determine: (1) whether, by enacting the statute, the Legislature intended to confer a right on an individual; (2) whether the right "is not so 'vague and amorphous' that its enforcement would strain judicial competence," and (3) whether the statute "unambiguously impose[s] a binding obligation on the [governmental entity]."
>
> In addition to satisfying those three "factors," for purposes of our Civil Rights Act, plaintiffs must

> also "show that the right is substantive, not procedural." . . .
>
> In essence, a substantive right is "[a] right that can be protected or enforced by law; a right of substance rather than form." Black's Law Dictionary 1437, 1438 (9th ed. 2009) (defining a procedural right, in contrast, as "[a] right that derives from legal or administrative procedure; a right that helps in the protection or enforcement of a substantive right").
>
> [Harz, 234 N.J. at 331-32 (bracketed alterations in original) (emphasis added) (additional citations omitted).]

In Harz, the Court found that a property owner's statutory right to appeal from the decision of a zoning officer was substantive:

> Here, the nature of the substantive right at issue—a property right—is clearly identifiable. The right of an interested party to appeal the issuance of a zoning permit—to have her concerns 'heard'—is rooted in principles of property rights, specifically the right to not be deprived of an interest in one's property without process.
>
> [Id. at 333.]

Against that backdrop, we begin our analysis by considering the possible sources of the rights plaintiffs asserted here. Like the trial court, plaintiffs rely heavily on the public trust doctrine. On the one hand, it can be argued that since the doctrine is grounded in the common law rather than in statutory or constitutional provisions, a violation of the doctrine is not covered by the CRA. On the other hand, because the CRA is remedial legislation, and

because it uses the term "laws" rather "statutes," it could be argued that the Legislature intended the term "laws" to include fundamental rights enshrined in our common law and that the right to use the beaches is such a fundamental right. The Supreme Court has never extended the CRA that far, however, and we need not decide that novel issue here.[11] Plaintiffs were not prevented from using the Borough's beach, which is the core substantive right protected by the public trust doctrine, and their right to pay reasonable beach fees is protected by a statute.

Thus, we look to N.J.S.A. 40:61-22.20(a), which delegates to municipalities the State's responsibilities under the public trust doctrine and is integral to its enforcement.

> The statute amounts to a delegation to a municipality having a dedicated beach (dry sand area) of the state's police power over that area and the tide-flowed land seaward of the mean high water mark; the proviso indicates an affirmation of the state's paramount interest and inherent obligation in insuring that such seaward land be equally available for the use of all citizens.
>
> [Avon, 61 N.J. at 301-02.]

---

[11] Research reveals no reported opinions awarding CRA counsel fees for a violation of the public trust doctrine or the beach fee statute. In Secure Heritage, 361 N.J. Super. at 310-11, which predated enactment of the CRA, the plaintiff sought counsel fees for proving a violation of the public trust doctrine. We found no source of authority for a fee award.

We have also recognized that "a municipality's obligation to charge only reasonable, non-discriminatory beach fees is a well-established component of the public trust doctrine[.]" Borough of Avalon v. N.J. Dep't of Envtl. Prot., 403 N.J. Super. 590, 607-08 (App. Div. 2008). The beach fee statute enforces that component.

We conclude that a violation of N.J.S.A. 40:61-22.20(a)'s prohibition on unreasonable beach fees would entitle an injured plaintiff to an award of counsel fees under the CRA, but a violation of financial accounting rules would not. The statutory mandate that municipalities charge "reasonable" beach fees states a substantive individual right of members of the public.[12] N.J.S.A. 40:61-22.20(a). It is a "clearly identifiable" right, rooted in the historic and fundamental principle of public access to the beach. Harz, 234 N.J. at 333. See Borough of Avalon, 403 N.J. Super. at 607-08. On the other hand, N.J.S.A. 40:61-22.20(a) contains no specific provision, unambiguous or otherwise, that guarantees the public a right to any particular form of municipal financial accounting or fund allocation, including the creation of a

---

[12] In so holding, we do not mean to imply that every rate-setting statute creates a substantive individual right that can be enforced under the CRA. The beach fee statute is unique; in prohibiting unreasonable beach fees, it safeguards a fundamental public right of beach access. See Avon, 61 N.J. at 302. We also do not decide here whether physical exclusion from the beach would entitle an excluded party to CRA counsel fees under N.J.S.A. 40:61-22.20; that issue is not before us.

separate beach fund. The only unambiguous fiscal-related obligation the statute creates is the requirement that a municipality charge beachgoers "reasonable" beach fees.[13] See Harz, 234 N.J. at 331-32.

As previously noted, the Borough did not physically exclude plaintiffs from the beach, or attempt to do so, and plaintiffs did not prove that the current beach-badge fees were unreasonable. The fact that, at some future point, the Borough might charge unreasonably high beach-badge fees as a result of having misallocated monies due to the beach fund, does not constitute the current violation of a substantive right. Nor does that conduct constitute an attempt to interfere "by threats, intimidation or coercion" with the exercise of either of those substantive rights. N.J.S.A. 10:6-2(c). See Tumpson, 218 N.J. at 473. The only unreasonable fee that plaintiffs proved the Borough actually imposed on them was the increased fee for beach parking which, in the particular circumstances of this case, was tantamount to a beach fee. Accordingly, with the exception of that limited and discrete claim, plaintiffs were not entitled to counsel fees under the CRA, N.J.S.A. 10:6-2(f).

---

[13] Likewise, for CRA purposes, we could not infer such an unambiguous "substantive right" of proper municipal accounting from the common law. It would be anomalous to limit substantive statutory rights to those unambiguously guaranteed by a statute, but to apply a looser standard to rights created by the common law.

We therefore reverse the order awarding counsel fees except as to the parking fee claim. We remand the case to the trial court to recalculate the fee award based on plaintiffs' limited success on their CRA-related claims. See Szczepanski v. Newcomb Med. Ctr., Inc., 141 N.J. 346, 354-56 (1995). For the court's guidance on remand, we reject defendant's arguments that no counsel fees were due because there was no retainer agreement and that any fee award should be paid from the beach fund rather than the general fund. As we held in DeSanctis, those arguments are completely without merit, and they do not warrant further discussion. DeSanctis, 455 N.J. Super. at 335-36; R. 2:11-3(e)(1)(E).[14]

Affirmed in part, reversed in part, remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

[14] We have not specifically addressed defendants' contentions based on the separation of powers doctrine, because those arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).